

# OBERHEIDEN PC

**ATTORNEYS**

DR. NICK OBERHEIDEN
Washington D.C., New York

LYNETTE S. BYRD
Texas

ELIZABETH K. STEPP
New York, Texas

P. COVARRUBIAS MEYER
Texas

HON. BRIAN KUESTER
Oklahoma

JOHN W. SELLERS
Maryland

LINDA JULIN MCNAMARA
Florida

WILLIAM H. NEWMAN
New York, Georgia, Virginia, Pennsylvania

JENNIFER W. CORINIS
Florida, Massachusetts

ELLEN COMLEY
Texas

ALINA VENEZIANO
New York, Nevada, Arizona, Utah

PAUL STRICKLAND
California

SHREY SHARMA
New York

**OF COUNSEL**

HON. MIKE R. POMPEO
Washington D.C.

HON. TREY GOWDY
South Carolina

**CONSULTANT**

HON. KEVIN MCCARTHY

**LOCAL COUNSEL**

HON. S.A. MARSHALL
Oregon

JIM GRIFFIN
South Carolina

COREY STEINBERG
Florida

RICHARD T. SIMMONS
Louisiana

DAVID RABEN
Florida

ERICK CRUZ
Florida

KAREN PICKETT
Massachusetts

MICHAEL A. RATAJ
Michigan

BILL TUNKEY
Florida

KAMILLE DEAN
Ariz., Utah, Cal., Minn., Col.

JOSEPH NASCIMENTO
Florida

TERRY C. FRANK
Virginia, North Carolina

440 LOUISIANA STREET, STE 200
HOUSTON, TX 77002

February 3, 2025

*via ECF*
The Hon. Zahid N. Quraishi
United States District Court, District of New Jersey
402 East State Street
Trenton, New Jersey 08608

    RE:  U.S. v. Ndubizu, 22-cr-234 (ZNQ) – Defendant's Rule 29 and Rule 33 Motions

Your Honor,

This Firm represents Florence Ndubizu.  I write in support of Ms. Ndubizu's motions pursuant to Fed. R. Crim. P. 29 and 33, for a judgment of acquittal and for a new trial.

## I.  Legal Standard

Ms. Ndubizu moves pursuant to Fed. Rs. Crim. P. 29 and 33.  The Rule 29 standard is higher, requiring the Court to view the evidence in the government's favor.  The Rule 33 standard is lower, permitting the Court to evaluate the evidence and decide if the verdict went against the weight of the evidence.

Under either standard, the evidence at trial was insufficient to sustain the verdicts.

### A. Rule 29

Courts grants motions for an acquittal when the United States fails to present evidence of each of the elements of the charged offense.  They also grant acquittal motions when there is a variance between the crime charged in the indictment and the one presented at trial.

1. The Court May Acquit if There is Insufficient Evidence of Required Elements

When deciding a Rule 29 motion, a court must decide "whether, under the facts presented at trial and viewed in the government's favor, the charges … were substantiated by defendants' conduct."  *United States v. Lore*, 4 F. Supp. 2d 352, 356 (D.N.J. 1998).  *See also United States v. Williams*, 260 F. Supp. 2d 1368, 1380 (S.D. Ga. 2003), *aff'd* 2003 U.S. App. LEXIS 27698 (11th Cir. Sept. 3, 2003).

When determining whether a conviction for conspiracy can survive a Rule 29 challenge, a court must determine "whether the jury could infer beyond a reasonable doubt that [the defendant] joined from testimony and other evidence showing the existence of a conspiracy and from physical evidence recovered by agents."  *United States v. Sadiq*, 783 F. Supp. 98, 98 (E.D.N.Y. 1992).  The court in *United States v. Rodriguez*, 2003 U.S. Dist. LEXIS 17729, *37-38 (E.D. Pa. Oct. 2, 2003) noted that granting an acquittal is appropriate when, even with "permissible inferences, … there is insufficient evidence to allow a rational juror to find guilt beyond a reasonable doubt."

For the conspiracy charge, the United States needed to prove that Ms. Ndubizu joined "some type of agreement, mutual understanding, or meeting of the minds to try to

The Hon. Zahid N. Quraishi
February 3, 2025
Page 2

accomplish" the unlawful distribution of oxycodone.  1607:19-1608:19, 1617:18-1618:13.

For the drug premises charge, the United States needed to prove that Ms. Ndubizu "knew or intended that the distribution activity occurring at" her pharmacy (the "Pharmacy") was not for a legitimate medical purpose.  1619:9-11.

1. The Court May Acquit If a Conspiracy Shown at Trial Varies From the One Alleged in the Indictment

A conviction will also fail a Rule 29 challenge when there is a variance between the crime alleged in the indictment and a conspiracy the United States presents at trial that broadens the basis for a conviction.  *See United States v. Dwyer*, 2005 U.S. Dist. LEXIS 11144, *17 (D.N.J. June 9, 2005), *aff'd* 2012 U.S. App. LEXIS 14901 (3d Cir. July 20, 2012).

For example, in *Dwyer*, Judge Simandle granted a motion for acquittal where the government offered evidence about false statements not included in the indictment.  Since the grand jury's indictment related to a specific false statement, the court held that the defendant was not "required to defend" against the allegation of other false statements.  *Id.* at 22.  And in *United States v. Dellosantos*, 649 F.3d 109, 116 (1st Cir. 2011), the court granted a motion for acquittal where the United States presented evidence of multiple conspiracies without proving the defendant joined the specific conspiracy charged in the indictment.

A. Rule 33

Federal courts grant motions for a new trial when the verdict was "against the weight of the evidence."  *United States v. Villard*, 700 F. Supp. 803, 815-816 (D.N.J. 1988); *see also United States v. Medeiros*, 2023 U.S. App. LEXIS 33535, *14 (10th Cir. Dec. 19, 2023).

When deciding a Rule 33 motion, "the trial court has broad power to weigh the evidence and to consider the credibility of witnesses."  *Villard*, 700 F. Supp. at 815-16.  And it can "grant a new trial even where there is substantial evidence to sustain the verdict."  *United States v. Knight*, 800 F.3d 491, 504 (8th Cir. 2015).

I. **The Evidence at Trial Was Insufficient to Sustain the Veridcts**

Under both the Rule 29 and Rule 33 standards, the United States failed to present evidence that established beyond a reasonable doubt several necessary elements of the crimes charged in the Indictment.

A. Insufficient Evidence that Ms. Ndubizu Made an Agreement or Intended to Further Illegal Goals

The government only presented two types of evidence of an agreement between Ms. Ndubizu and any of the co-conspirators named in the Indictment to illegally distribute oxycodone.  Neither can establish Ms. Ndubizu made such an agreement.

1. Mr. Ogunyemi's Testimony

The first type of evidence was the testimony of the government's cooperating witness, Mr. Ogunyemi.

    a. *Ms. Ndubizu's Statement that HIV-Positive Patients Need Medication Cannot Reasonably Indicate a Drug Conspiracy*

Mr. Ogunyemi testified that he believed Ms. Ndubizu held Ronald Briggs to looser standards than other patients when filling oxycodone prescriptions. But he was clear that the sole basis for this understanding came from the following conversation:

> Q. How did you know -- all the things that you just said about why the customers should be treated differently, how did you know to treat the customers differently?
>
> A. Ms. Florence gives us specific, you know, instructions, you know, due to kind of the patients we have because when I started working over there, she -- you know, she -- she showed me around. She, you know, showed me the medications. I got familiar with the medications. You know, part of the patients, you know, taking these medications -- so, you know, **when this people comes, they have to get their medication because like I said, most of these people on life maintenance medication, they take the pain medication to sustain themselves**. So, you know, yeah, she showed me all this.

936:20-937:8. Mr. Ogunyemi affirmed that he had no other basis for his belief:

> Q. I think you had told Mr. Ramey that there were rules for regular customers and then rules for the life maintenance customers, right?
> A. That's correct, yeah.
> Q. And Mr. Ramey asked you, how did you know about this? And you had testified that Ms. Ndubizu had told you that when the life maintenance customers come in, they have to get their medication; is that right?
> A. When it is ready on that day, yes, sir. That's correct, yeah.
> Q. **Besides that, did she tell you anything more specific about the different treatment for the life maintenance customers**?
> A. **No. Just make sure, you know, their medication is ready**; they're life maintenance. And when they come with their pain medication, if it goes through that day, make sure they get that medication, yes.

1071:6-22. This statement alone does not indicate an agreement to provide drugs illegally. Instead, Mr. Ogunyemi presented no testimony that should cause a reasonable juror to interpret the statement differently from its plain meaning: that Mr. Ogunyemi should ensure patients with serious diseases promptly get medicine.

    b. *Mr. Ogunyemi's Testimony That Ms. Ndubizu Was Aware that Mr. Odom and Mr. Briggs Sold Drugs Does Not Indicate an Agreement*

Mr. Ogunyemi also testified that Ms. Ndubizu knew Mr. Briggs and Kenneth Odom were selling drugs in the Pharmacy. But this awareness is insufficient to establish an agreement. The jury instructions on this

point were clear:

> Evidence which shows that Florence Ndubizu only knew about the conspiracy, or only kept "bad company" by associating with members of the conspiracy, or was only present when it was discussed or when a crime was committed, is not sufficient to prove that Florence Ndubizu was a member of the conspiracy even if she approved of what was happening or did not object to it.

1610:4-11. Indeed, given that Mr. Ogunyemi testified that Ms. Ndubizu consistently scolded drug dealers and chased them out of the Pharmacy, any knowledge of their misconduct did not even constitute circumstantial evidence of her participation in a conspiracy. *See, e.g.,* 947:9-948:6, 948:14-19, 973:20-974:7, 1026:25-1027:7, 1071:23-1072:6, 1072:20-1073:3. Mr. Ogunyemi testified that Ms. Ndubizu would "scream" at Mr. Odom if he attempted to purchase or sell medications in the Pharmacy. 973:20-23. He also testified that he had personally observed Ms. Ndubizu instruct Mr. Odom that he was not permitted to sell medication in the Pharmacy. 973:24-974:4.

Because the only testimony about an understanding between Ms. Ndubizu and either Mr. Briggs or Mr. Odom was that Ms. Ndubizu expressly refused to support illegal drug sales, the government failed to present evidence of an agreement.

    c. *No Evidence, Including Mr. Ogunyemi's and Ms. Heller's Testimony, Supports the Claim Ms. Ndubizu Sold Mr. Odom Oxycodone*

The United States alleged that Ms. Ndubizu conspired with Mr. Odom by selling him oxycodone so he could re-sell it illegally. ECF No. 1 ¶ 40. But Mr. Ogunyemi did not testify that Ms. Ndubizu sold oxycodone to Mr. Odom at all. No witness did. And the evidence from the Pharmacy's Rx30 database confirms that Ms. Ndubizu made no oxycodone sales to him. *See* Trial Ex. 400.

Furthermore, Ms. Heller testified that *she* sold pills to Mr. Odom on one occasion and Ms. Ndubizu confronted her about it with disapproval the next day. 413:4-17. Ms. Heller admitted that Ms. Ndubizu never directed her to sell the pills. 415:16-18. In fact, Ms. Heller never had any conversations where Ms. Ndubizu directed her to illegally sell drugs at the pharmacy. 415:19-25.

    d. *Mr. Ogunyemi's Testimony About "Funny People" Does Not Indicate a Conspiracy*

Mr. Ogunyemi testified that Mr. Briggs made a vague statement to Ms. Ndubizu. He testified that Mr. Briggs said "funny people" had come to a building across the street and that Ms. Ndubizu should "be careful." 961:24-962:14. And the United States argued that this statement constituted evidence of a shared understanding between Mr. Briggs and Ms. Ndubizu that they were engaged in illegal activity. *See* 1647:2-5.

But Mr. Ogunyemi also testified that statements like this were common at the pharmacy. 1077:7-13. And the statement itself is too vague to satisfy the government's burden to show that Ms. Ndubizu had knowingly joined a criminal conspiracy.

> e. *The Weight of the Evidence Contradicts the Existence of a Conspiracy Whose Support Rests Entirely Upon the Testimony of an Unreliable Cooperating Witness*

The weight of the evidence does not support the existence of an agreement.

The entirety of the conspiracy claim relies upon Mr. Ogunyemi's testimony, but he is an unreliable witness. He admitted that he lied to federal agents. 878:11-14, 1111:13-16. He admitted that he knew that his immigration status – and his ability to see his young son grow up – depended on his non-prosecution agreement. 1113:20-1114:17. And he admitted that, before being presented with a target letter, he had nothing incriminating to say about Ms. Ndubizu, Mr. Odom, or Mr. Briggs. 1055:25-1056:14.

Mr. Ogunyemi's testimony also conflicts with Ms. Heller's testimony. Mr. Ogunyemi testified that Mr. Briggs and Mr. Odom *sold* pills at the pharmacy. 948:7-13, 1026:25-1027:7. Ms. Heller expressly repudiated the claim that Mr. Briggs brought people to the pharmacy to buy pills and instead testified that the two men *bought* pills at the pharmacy. 394:20-395:16, 400:19-21. The fact that no other witness can corroborate Mr. Ogunyemi's testimony indicates it deserves little weight.

Because the government's only evidence about the conspiracy is uncorroborated and comes from a witness who has admitted lying about Ms. Ndubizu and who continues to have a motive to lie, the guilty verdict is against the weight of the evidence.

> 2. Mr. Odom's Statement Does Not Indicate an Agreement to Illegally Sell Drugs

In addition to Mr. Ogunyemi's statement, Lt. Paul Gendron testified that he heard Mr. Odom state "that he delivered pills for the pharmacy." 1222:25.

This statement alone does not establish that Ms. Ndubizu made an agreement with Mr. Odom to illegally sell drugs. The statement did not mention Ms. Ndubizu at all and the officer was able to provide no other context for it since he relied upon his notes to discuss the single quote made during a routine arrest from a decade ago. 1224:3-6, 1224:20-1225: 15.

And, even if one could construe the statement as referring to an agreement between Ms. Ndubizu and Mr. Odom for the latter to deliver medication for the Pharmacy, no evidence established that any such agreement was for the distribution of drugs for no legitimate medical purpose. Uncontested testimony at trial established that Ms. Ndubizu could and did hire delivery personnel and that deliveries, according to the government's expert, were an entirely legitimate practice. 408:24-409:5, 1140:18-1141:5. And so even if the statement indicated an agreement to legitimately deliver medicine, no evidence indicated Ms. Ndubizu's awareness of, let alone intent to participate in, an agreement to deliver to oxycodone for no legitimate medical purpose.

> B. <u>Insufficient Evidence Ms. Ndubizu Intentionally Distributed Oxycodone Not for a Legitimate Medical Purpose</u>

The United States presented four types of evidence that Ms. Ndubizu distributed oxycodone for no legitimate medical purpose. But none indicate Ms. Ndubizu's intent and so none support a guilty verdict.

1. No Evidence "Red Flags" Indicated Ms. Ndubizu's Criminal Intent

The government presented evidence to suggest that there were irregularities at Ms. Ndubizu's pharmacy. These irregularities included a high volume of oxycodone purchases, patients and doctors with addresses in New York or Pennsylvania, and individual written prescriptions missing signatures.

None of these "red flags" indicated Ms. Ndubizu's intent to sell oxycodone for no legitimate medical purpose in the absence of calls to doctors. The government's expert testified that these issues should prompt a pharmacist to call the prescriber to verify the legitimacy of prescriptions. *See* 1118:3-15, 1268:1-18 1357:2-5. And there was ample evidence that Ms. Ndubizu did exactly that, including two recordings, a stipulation, and the testimony of Mr. Ogunyemi. *See, e.g.,* Ex. 23 at 23:40, Ex. 710B, 923:2-9, 1064:5-13, 1082:5-8, 1414:7-12, 1565:23-1566:5. There was also evidence that Ms. Ndubizu responded to red flags by calling the police to report a fake prescription and threatening to call the police when a customer tried to fill another fake prescription. Ex. 31A, 1416:11-16. And when confronted with evidence that Ms. Ndubizu called a doctor to verify a prescription, the government's expert admitted that the defendant followed the correct protocols for a practicing pharmacist: 1348:11-15.

Although the government argued that Ms. Ndubizu had done a poor job of identifying and investigating irregularities, it presented no evidence that she was anything more than negligent, much less any evidence proving beyond a reasonable doubt that she intentionally ignored red flags because of a specific intent to distribute drugs for no legitimate medical purpose. The only witness who testified about Ms. Ndubizu's intent was Mr. Ogunyemi, and he testified consistently that Ms. Ndubizu had insisted on limiting sales to purchasers requesting them for legitimate medical purposes. *See* 919:8-920:13, 922:4-923:9, 1072:7-10.

2. No Evidence "On Hold" Designation Indicated Ms. Ndubizu's Criminal Intent

Mr. Ogunyemi and Diversion Investigator Janelle DiMatteo testified that Ms. Ndubizu designated some prescriptions as "on hold" in the Pharmacy's computer system. But no one ever testified that the reason Ms. Ndubizu put any prescriptions on hold was for an improper purpose. Instead, Mr. Ogunyemi testified about why he thought prescriptions were "on hold" – to avoid scrutiny from the state Prescription Monitoring Program. *See* 990:2-22. (For the sake of clarity, Mr. Ogunyemi stated that he spoke in the first person plural when referring to himself. *See, e.g.,* 972:25-973:2). But even so, he never stated that his belief came from anything Ms. Ndubizu said or did. *See* 990:2-22.

In any event, DI DiMatteo confirmed that the Pharmacy designated only about 100 prescriptions as "on hold" out of over 39,000 Schedule II prescriptions. *See* 543:13-544:2, 544:16-18, 580:4-9, 814:6-13. Mr. Ogunyemi's stated reason for designating a prescription as "on hold" therefore does not match the facts: if Ms. Ndubizu wanted to hide her large volume of oxycodone sales, it does not make sense for her to have hidden an insignificant number - only 0.2% - of the relevant prescriptions.

3. No Evidence the DEA's Three Audits Indicated Ms. Ndubizu's Criminal Intent

The United States presented evidence that it conducted three audits of Ms. Ndubizu's inventory of oxycodone and concluded that pills were missing. No one testified that these audits are circumstantial evidence of Ms. Ndubizu's intent. To the contrary, Dr. Martha Little testified that there are benign

explanations for why the number of pills the DEA counted differs from the number the DEA expected to find.  1475:6-1476:12.  The DEA's own analyst, Paul Short, testified similarly.  213:3-16.

And the DEA's work is hardly reliable since its needed to re-do its work twice.  Originally it believed a staggering 8 million pills were missing.  788:16-19.  Then it believed 80,000 pills were missing, put that number in the indictment, and conceded that number is wrong, too.  795:17-19, 796:10-13, ECF No. 1 ¶ 37.  While DI DiMatteo testified that a formatting error was the problem with the second audit, that would not explain why the actual number of pills the DEA itself counted changed from the second to the third audit.  798:8-802:1.  Even if this shortage were relevant to Ms. Ndubizu's intent, the constantly changing numbers cannot possibly prove anything beyond a reasonable doubt.

    4.   No Evidence Ms. Ndubizu Supplied Oxycodone Despite Knowledge Customers Would Re-Sell It

The evidence that Ms. Ndubizu was aware that some customers improperly sold their drugs also did not establish that Ms. Ndubizu intended to distribute oxycodone for no legitimate medical purpose.

The bulk of this evidence came from Mr. Ogunyemi.  He testified that he informed Ms. Ndubizu that customers were selling their prescription medication.  *See* 947:17-948:13.  But he also testified that Ms. Ndubizu ejected customers when that happened.  948:14-19, 973:20-23.  To be sure, Mr. Ogunyemi testified that Ms. Ndubizu continued to sell oxycodone to Mr. Briggs even after he told her that Mr. Briggs sold his pills.  *See* 948:20-25.  But Mr. Ogunyemi also testified that Ms. Ndubizu did stop selling oxycodone to Mr. Briggs and his friends.  1062:10-18.  And the Rx30 database confirms that the Pharmacy did not sell oxycodone to Mr. Briggs after September 2016.  Trial Ex. 400.  The only issue is whether any gap in time between Mr. Ogunyemi's statement and the end of the sales indicates Ms. Ndubizu's knowledge or intent.  It does not because the logical inference from Mr. Ogunyemi's testimony – that Ms. Ndubizu repeatedly stated her opposition to improper drug sales and stopped sales to Mr. Briggs – is that Ms. Ndubizu decided to stop sales to Mr. Briggs once she agreed with Mr. Ogunyemi that he was improperly selling pills.  Since there was no evidence that she agreed immediately upon hearing Mr. Ogunyemi's claim, there is no evidence that any gap in time indicated her knowledge or intent.

Mr. Ogunyemi also testified that other customers complained to Ms. Ndubizu that people approached them to buy their pills.  954:1-5.  But Mr. Ogunyemi did not testify that these customers proceeded to sell their pills to the attempted purchasers.  In fact, the most reasonable inference from the customers' complaints was that they refused the purchasers' advances.  This testimony therefore fails to establish that Ms. Ndubizu sold oxycodone to customers knowing that they had no legitimate medical purpose for them.

Mr. Ogunyemi also testified that Mr. Briggs sold drugs in the pharmacy where Ms. Ndubizu would have seen them.  *See* 946:24-947:8.  But he also testified that it was unclear whether Ms. Ndubizu actually saw the drug sales since her view depended on whether she was seated.  947:12-16.  And, as noted *supra*, he testified (and the Rx30 database confirms) that Ms. Ndubizu stopped selling oxycodone to Mr. Briggs and his friends.  1062:10-18, Trial Ex 400.  Since Mr. Ogunyemi did not testify about when Ms. Ndubizu could have observed improper drug sales, there is no evidence that Ms. Ndubizu sold any oxycodone to Mr. Briggs after having observed anything improper.

Finally, the United States noted that Ms. Ndubizu sold oxycodone to a woman named Elizabeth Altland in December 2014 after she reported her to the Trenton Police Department in March 2014 for bringing a fake prescription. *See* 1715:3-16. This sale does not indicate Ms. Ndubizu's intent to sell oxycodone for no legitimate medical reason because the government offered no evidence about whether the December prescription was illegitimate or whether Ms. Ndubizu failed to properly confirm it. Without any proof that Ms. Ndubizu knew the December prescription was invalid, the sale does not provide any information about her intent to fill prescriptions for no legitimate medical purpose.

In any event, Mr. Ogunyemi's claim that the Pharmacy was an "open air drug market" is against the weight of the evidence. On this point, nine witnesses testified that they saw no illegal drug sales in the pharmacy:

- Three law enforcement officers – Lt. Joseph Angerone and two anonymous officers – testified at trial about their undercover work at the Pharmacy. None testified that they witnessed other peoples' illegal drug sales inside the premises. The United States also offered hours of video evidence from inside the Pharmacy, none of which depicts other peoples' illegal drug sales or Ms. Ndubizu's observation of simulated drug sales.

- Employee Gleenell Anthony testified that she saw no illegal drug sales at the Pharmacy. 1546:13-19.

- Five different Pharmacy customers – Phyllis Shorts Bell, Darryl Smith, Belinda Brown, Kathryn Grist, and Robert Grier, Jr., each testified (either in person or through stipulation) that they did not see any illegal drug sales. 1436:12-16, 1539:14-19, 1586:16-1588:24.

Additionally, Ms. Heller's testimony conflicts with Mr. Ogunyemi's. She testified that she had been a Pharmacy customer for five years before working there and did not believe Ms. Ndubizu was aware of anything illegal during that time. 384:15-21, 414:6-8, 415:6-11. This contradicts Mr. Ogunyemi's testimony that illicit drug sales in the Pharmacy could have been obvious to any observer. And to the extent that Ms. Heller testified that illicit drug sales took place at the Pharmacy, her testimony does not corroborate Mr. Ogunyemi's. Ms. Heller described a system in which Ms. Ndubizu raised her voice to alert drug dealers of a potential to *buy* drugs. 394:4-19. Mr. Ogunyemi described a system in which drug dealers brought people's prescriptions to the pharmacy so they could later *sell* drugs. 944:8-24. Because the two stories are inconsistent, Ms. Heller's testimony does not add weight to Mr. Ogunyemi's.

Given the bulk of the testimony that contrasts with Mr. Ogunyemi's testimony, it is against the weight of the evidence.

   C. <u>Insufficient Evidence that Ms. Ndubizu Knew or Intended that the Distribution Activity Occurring at Her Pharmacy Was Unauthorized</u>

To prevail on the drug premises charge, the United States needed to prove that Ms. Ndubizu "knew or intended that the distribution activity occurring at" her Pharmacy was not for a legitimate medical purpose. 1619:9-11.

As set forth above in Sections II.A and II.B(4), the only clear testimony about Ms. Ndubizu's intent came from Mr. Ogunyemi, and it was that Ms. Ndubizu repeatedly rejected any involvement with drug dealers

The Hon. Zahid N. Quraishi
February 3, 2025
Page 9

and ejected them from the premises. *See, e.g.*, 947:9-948:6, 948:14-19, 973:20-974:7, 1026:25-1027:7, 1071:23-1072:6, 1072:20-1073:3.

Moreover, the weight of the evidence is that most witnesses testified that they observed no illicit drug sales at the Pharmacy and that Ms. Ndubizu called doctors to confirm the legitimacy of oxycodone prescriptions. *See* Section II.B(1) and (4). Accordingly, Ms. Ndubizu is entitled to a new trial on this charge.

## II.     The Conspiracies Argued at Trial Varied From the Indictment, Requiring An Acquittal

The Court should grant an acquittal because the conspiracy set forth in the Indictment varies from the two the United States presented at trial. The Indictment set forth ten "Manner[s] and Means" of the charged conspiracy:

1. Ms. Ndubizu purchased oxycodone knowing that her customers fraudulently obtained prescriptions. ECF No. 1 ¶ 31.

2. Ms. Ndubizu filled prescriptions with visible irregularities. *Id* ¶ 32.

3. Ms. Ndubizu filled prescriptions for high dosages, powerful combinations, and for patients with multiple doctors and out-of-state addresses. *Id* ¶ 33.

4. Ms. Ndubizu failed to call doctors to confirm prescriptions. *Id* ¶ 34.

5. Ms. Ndubizu filled prescriptions for patients who had previously filled fraudulent prescriptions. *Id* ¶ 35. This part of the Indictment cited specifically prescriptions from Dr. Dean Newton. *Id.*

6. Ms. Ndubizu directed employees to take cash payments in excess of a drug's retail price for oxycodone and then to conceal those sales from state records. *Id.* ¶ 36.

7. Ms. Ndubizu hid the fact that 80,000 oxycodone pills were missing as the DEA discovered in an audit. *Id.* ¶ 37.

8. Ms. Ndubizu directed employees to dispense oxycodone in the absence of a pharmacist. *Id.* ¶ 38.

9. Ms. Ndubizu directed employees to dispense oxycodone in circumstances indicating diversion, specifically through the dispensing of multiple pill bottles. *Id.* ¶ 39.

10. Ms. Ndubizu dispenses oxycodone to Mr. Odom and Mr. Briggs, knowing that they would re-sell the drugs illegally. *Id.* ¶ 40.

At trial, however, the United States presented evidence of two different conspiracies. It acknowledged in closing arguments that Ms. Ndubizu obeyed the law, even when being observed and recorded in undercover operations. 1635:2-5. But it told the jury that it could convict Ms. Ndubizu of conspiracy pursuant to two new theories that are not in the Indictment:

- First, that Ms. Ndubizu sold oxycodone to Mr. Briggs in an effort to retain lucrative HIV-medication patients. 1646:15-1647:1.

- And second, that Ms. Ndubizu sold oxycodone for cash to an unnamed man from Philadelphia who does not appear in the Indictment in an arrangement unrelated to any agreement to sell to

   Mr. Briggs.  1645:7-13.

Even if the United States had proven Ms. Ndubizu entered into a conspiracy to sell drugs illegally for access to lucrative HIV patients, or entered into a conspiracy to supply the unnamed Philadelphia man, these were not the conspiracies in the Indictment.  Accordingly, as in *Dwyer* and *Dellosantos*, this Court should order an acquittal.

### III. Conclusion

The United States relied heavily on its cooperating witness to establish Ms. Ndubizu was not just negligent in preventing sales to drug abusers, but deliberately formed a conspiracy with them.  However, a close examination of his testimony establishes that the cooperating witness did not testify that Ms. Ndubizu knew or intended that her oxycodone sales were for no legitimate medical purpose.  Nor did he testify about Ms. Ndubizu's membership in an agreement.  The other evidence at trial also fails to establish those necessary elements of the crimes charged.  Accordingly, this Court should enter an acquittal.

Moreover, even if the United States had presented sufficient evidence on Ms. Ndubizu's intent or conspiracy membership, the weight of the evidence – including considerable video evidence and testimony by the cooperating witness – that Ms. Ndubizu made good faith efforts to confirm the validity of prescriptions and to expel drug dealers weighs against a guilty verdict.

Finally, the government's new theories, not charged in the Indictment, cannot sustain a guilty verdict.  Ms. Ndubizu had the right to be tried on the allegations in the Indictment, rather than new theories that arose during trial.  The Court should therefore grant an acquittal.

Respectfully submitted,

_____

William Newman

Oberheiden, P.C.